109 F.3d 836
 Gerald EINAUGLER, M.D., Petitioner-Appellant,
v.
SUPREME COURT OF the STATE OF NEW YORK, Kings County, Neil
J. Firetog, Honorable, Edward J. Kuriansky, and
Dennis C. Vacco, Attorney General of the
State of New York,
Respondents-Appellees.
 No. 328, Docket 96-2211.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 15, 1996.
Decided March 10, 1997.
 
 Peter A. Chavkin (Michael J. Grudberg), Stillman, Friedman & Shaw, P.C., New York City, for Petitioner-Appellant.
 Arthur G. Weinstein, Special Assistant Attorney General of the State of New York, (Dennis C. Vacco, Attorney General; Donald H. Zuckerman, Special Assistant Attorney General), for Respondent-Appellees.
 Before: OAKES and CALABRESI, Circuit Judges, and HAIGHT, District Judge.*
 CALABRESI, Circuit Judge:
 
 
 1
 Dr. Gerald Einaugler appeals from an order of the United States District Court for the Eastern District of New York (Korman, J.), entered March 8, 1996, denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Einaugler had been convicted, after a jury trial in the New York State Supreme Court, of reckless endangerment in violation of N.Y. Penal Law § 120.20 and of willful patient neglect in violation of N.Y. Public Health Law § 12-b. In his habeas petition challenging the conviction, Einaugler argued (1) that there was insufficient evidence at trial to establish the elements of reckless endangerment or patient neglect beyond a reasonable doubt, (2) that the admission of evidence that the allegedly neglected patient subsequently died violated Einaugler's right to due process, and (3) that the laws under which Einaugler was convicted are unconstitutional as applied to him because they make criminal the exercise of medical judgment and because they provided inadequate notice that his actions were within their scope. He renews these arguments on appeal from the denial of his petition. Because we conclude that there was sufficient evidence to support Einaugler's conviction, and because we find his other claims to be without merit, we affirm the order of the district court.
 
 I. BACKGROUND
 
 2
 The charges against Einaugler arose from his treatment of Alida Lamour, a patient at the Brooklyn Jewish Hospital Nursing Home (BJHNH), where Einaugler worked. On Friday, May 18, 1990, six days before she died, Lamour was returned to the nursing home after treatment for renal disease at the nearby Interfaith Hospital. At the nursing home, Einaugler, acting as attending physician, mistakenly ordered that a feeding solution be administered through Lamour's kidney dialysis catheter. Early on Sunday morning, May 20, 1990, after the feeding solution had been administered for two days, a nurse noticed that Lamour was having difficulty breathing, that her abdomen was distended, and that she had vomited. The nurse, realizing the error, immediately attempted to drain the remaining feeding solution out of the patient's peritoneal space through the catheter. At approximately 6 a.m. on Sunday morning, Einaugler was notified of his error and told of Lamour's condition.
 
 
 3
 At trial, there was conflicting evidence about the events of Sunday after 6 a.m. and before 4:30 p.m. There is no doubt that Einaugler called Dr. Irving Dunn, the Chief of Nephrology at Interfaith Hospital, who had treated Lamour during her last hospital stay, and sought his advice about Lamour. Einaugler testified that Dunn told him that it did not seem like an emergency, and that Einaugler should send Lamour to the hospital on Monday for further treatment. Dunn testified that he directed Einaugler to hospitalize the patient. His testimony is ambiguous as to whether he conveyed to Einaugler the importance of doing this immediately. Sometime after talking to Dunn, Einaugler wrote the following note in Lamour's chart: "Spoke to Doctor Dunn, (Renal). Told to send patient over for evaluation to IMC [Interfaith] ER [Emergency Room]." Dunn testified that this note accurately summarized his morning conversation with Einaugler. Einaugler instead testified that the note, although "grammatically incorrect," was written after Lamour had been sent to the hospital late Sunday afternoon and signified that he, Einaugler, had given instructions to send Lamour to the emergency room.
 
 
 4
 Later, between 11 a.m. and 2 p.m. on Sunday, Einaugler reported the mistake to Dr. Albert Khaski, the supervising physician at the nursing home. He told Khaski that Dunn had said that Lamour's condition was not an emergency and could wait until Monday for hospitalization. Einaugler testified that Khaski agreed. Khaski, on the other hand, testified that he had disagreed and had instructed Einaugler to transfer Lamour to the hospital that day. At approximately 4:30 p.m., a nurse informed Einaugler that Lamour was less responsive, unable to take food by mouth, and looked weak. Einaugler then ordered that Lamour be transferred to Interfaith Hospital, where testimony suggests she went essentially untreated until Monday morning. On Monday, Lamour received lavage to remove the remaining feeding solution from her peritoneal cavity and antibiotics to prevent infection. She nonetheless died four days later.
 
 
 5
 Einaugler was subsequently charged and convicted of reckless endangerment and willful neglect for delaying Lamour's hospitalization once he knew that to do so would create a serious risk of physical injury. He was sentenced to incarceration for fifty-two weekends. The Appellate Division of New York State Supreme Court affirmed his conviction, People v. Einaugler, 208 A.D.2d 946, 618 N.Y.S.2d 414 (1994), and the Court of Appeals denied his application for leave to appeal. People v. Einaugler, 84 N.Y.2d 1031, 623 N.Y.S.2d 187, 647 N.E.2d 459 (1995). Einaugler then petitioned for a writ of habeas corpus. Einaugler v. Supreme Court of the State of New York, 918 F.Supp. 619 (E.D.N.Y.1996). The district court denied his petition, but granted a certificate of probable cause, and stayed the judgment and conviction pending the disposition of Einaugler's appeal.
 
 II. DISCUSSION
 
 6
 We review a district court's denial of a petition for a writ of habeas corpus de novo. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir.1996).
 
 A. Sufficiency of the Evidence
 
 7
 The Due Process Clause of the Fourteenth Amendment prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Consequently, a state prisoner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-92, 61 L.Ed.2d 560 (1979) (footnote omitted). Hence, we must consider whether, as a matter of federal law, there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law. See id. at 324 & n. 16, 99 S.Ct. at 2792 & n. 16; Green v. Abrams, 984 F.2d 41, 44-45 (2d Cir.1993).[1] In evaluating whether the evidence is sufficient, we must "view[ ] the evidence in the light most favorable to the prosecution." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.
 
 
 8
 Einaugler claims that the district court erred in finding that the trial evidence was sufficient to support his conviction. He argues that no reasonable jury could have found that he ignored the requisite standard of professional conduct in failing to send Lamour to the hospital before Sunday afternoon. We disagree. An appellant challenging the sufficiency of the evidence "bears a very heavy burden." Quirama v. Michele, 983 F.2d 12, 14 (2d Cir.1993) (citation and internal quotation marks omitted). Einaugler has not met that burden, for, as is not infrequently the case where sufficiency of the evidence is challenged, this is a situation in which a jury could have found, and apparently did find, that "the combination of many small pieces of valid evidence--each of which [was] established 'more probably than not' " was adequate, in sum, to establish the elements of each crime beyond a reasonable doubt. United States v. Martinez, 54 F.3d 1040, 1045 (2d Cir.1995) (Calabresi, J., concurring), cert. denied, --- U.S. ----, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995).
 
 
 9
 The reckless endangerment charge required proof that Einaugler had recklessly engaged in conduct that created a substantial risk of serious physical injury. N.Y. Penal Law § 120.20. For Einaugler's act to be reckless, he must have grossly deviated from a reasonable person's standard of conduct and consciously disregarded a substantial and unjustifiable risk. See N.Y. Penal Law § 15.05 (defining "recklessly").
 
 
 10
 Despite the fact that when Lamour was finally sent to the hospital she was not treated until the next day, a rational jury could have concluded from Dr. Dunn's testimony and from Einaugler's note on the patient's chart: (1) that Einaugler called Dunn for instructions regarding Lamour's treatment, (2) that Dunn told Einaugler to transfer Lamour to the hospital, (3) that Dunn conveyed to Einaugler the importance of doing this promptly, and (4) that Einaugler ignored that message. Although Dunn did not recall whether he explicitly informed Einaugler that the transfer should be immediate, a jury could read his testimony as being unequivocal in directing Einaugler to transfer Lamour, and that this instruction conveyed immediacy. For example, he testified that he "directed ... Einaugler to have the patient admitted, period," and agreed that Einaugler's note in Lamour's chart accurately summarized his order to Einaugler "to send Alida Lamour to the hospital that Sunday morning." Einaugler's note itself, since it clearly can be read to state that Einaugler was told by Dunn to sent the patient to Interfaith Hospital's emergency room (and not simply to the hospital) lends important support to a finding that Dunn conveyed urgency.[2] Dr. Khaski's testimony provides some further basis for the conclusion that Einaugler was told that he should hospitalize Lamour in short order.
 
 
 11
 A jury could also have found that Einaugler understood that Dunn had directed him to hospitalize Lamour immediately, that he knew that Dunn's instructions represented the requisite standard of medical care, and that he nevertheless failed to do as Dunn directed. A rational jury could, for example, have viewed the note as clear evidence that Einaugler both got the message that Dunn intended an immediate transfer, and that he recognized Dunn as an expert whose instructions indicated the appropriate treatment for Lamour. It follows that there is sufficient evidence to uphold a jury conclusion that Einaugler consciously deviated from what he knew to be the appropriate standard of care.
 
 
 12
 There was also sufficient evidence that the delay in hospitalizing Lamour created a substantial risk of serious physical injury and that the defendant was aware of that risk. See N.Y. Penal Law § 15.05; People v. Licitra, 47 N.Y.2d 554, 419 N.Y.S.2d 461, 393 N.E.2d 456 (1979). A "serious physical injury" is a "physical injury which creates a substantial risk of death, or which causes death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10).
 
 
 13
 Although there was no direct expert testimony that a delay would cause a risk of death, there was testimony that Lamour had peritonitis, that peritonitis must be treated, that peritonitis may cause fluid to enter the peritoneal cavity, that this process robs the blood stream of fluid and thus places a strain on the cardiovascular system, that peritonitis may be fatal especially to patients with cardiovascular problems or other medical conditions, and that Lamour suffered from cardiovascular disease and was otherwise in very poor health. Further testimony indicated that proper treatment would have involved lavage to remove the remaining feeding solution and intravenous fluid injection, and that such treatment could have prevented the consequences of fluid loss. Dunn himself, by analogizing Lamour's situation to that of victims of the Chernobyl accident, strongly indicated that while there was no risk of Lamour dying immediately from the peritonitis, what had happened to her--if untreated--caused a substantial risk of death some time later.
 
 
 14
 Finally, trial evidence depicting Einaugler's medical background and Einaugler's own testimony on what he knew about peritonitis and its consequences provided a sufficient basis for a rational jury to conclude that Einaugler understood that the delay in hospitalizing Lamour would cause a substantial risk of death. This evidence, viewed as a whole, provided an adequate basis for a rational jury to conclude that Einaugler was guilty of reckless endangerment beyond a reasonable doubt.
 
 
 15
 Einaugler's conviction for wilfully violating a public health law, pursuant to N.Y. Public Health Law § 12(b), by neglecting a patient in violation of N.Y. Public Health Law § 2803-d(7) is also supported by the evidence at trial. Under this law, a doctor neglects a patient when he or she "fail[s] to provide timely, consistent, safe, adequate, and appropriate services, treatment, and/or care to a patient." N.Y.Comp.Codes R. & Regs., tit. 10 § 81.1[c] (1996). In order to violate the law wilfully, Einaugler must have known that his conduct was illegal. See People v. Coe, 71 N.Y.2d 852, 527 N.Y.S.2d 741, 743, 522 N.E.2d 1039 (Ct.App.1988). For the reasons given above, the evidence at trial was sufficient for a rational jury to have concluded beyond a reasonable doubt that the appropriate standard of care required Einaugler to transfer the patient to the hospital once his mistake was discovered, and that Einaugler did not do so in a timely manner. Moreover, despite Einaugler's testimony, a reasonable jury could have concluded that Einaugler was aware that a failure to transfer Lamour immediately violated the appropriate standard of care. Since at trial Einaugler stipulated that he knew that neglecting a patient was illegal, we hold, as did the district court, that there was sufficient evidence at trial for the jury to conclude beyond a reasonable doubt that Einaugler was guilty of willful patient neglect.
 
 
 16
 We must, as we have done above, evaluate a habeas petition that argues insufficiency of the evidence "with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16. While the state might have strengthened its case against Einaugler by presenting expert testimony directly stating that Einaugler's delay in transferring Lamour caused a substantial risk of death, New York law has never required such testimony in a criminal case of reckless endangerment. This court has recognized that New York civil tort actions for medical malpractice in New York cannot get to a jury without such expert evidence, see, e.g., Sitts v. United States, 811 F.2d 736, 739-41 (2d Cir.1987). But we did so in recognition of the fact that nearly one hundred years of New York cases specified such a requirement. See id. (citing cases); Robbins v. Nathan, 189 A.D. 827, 179 N.Y.S. 281 (1919) (citing earlier cases). In other words, the New York courts established this rule. We did not. There is no indication at all that a similar requirement exists in New York as to criminal reckless endangerment. (In fact, this case provides evidence to the contrary since there was no such direct expert testimony in this case, and the New York courts affirmed the conviction.) Nor should we, absent such indications, extend the rule to criminal cases. While it may seem undesirable to differentiate between the forms of evidence required at criminal and civil trials involving standards of medical care, there may be grounds for doing so, such as the light burden of proof required to win a civil case, and the fact that scienter is needed to support a criminal conviction but not a civil malpractice verdict.
 
 
 17
 Habeas corpus review is narrow and constrained. We may only overturn a state conviction when that conviction was obtained in violation of a federal constitutional right. A state rule of evidence "does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar." Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). It would go far beyond the proper role of this court in considering a writ of habeas corpus to determine that, by failing to recognize that New York law implicitly requires expert testimony to convict a criminal defendant of reckless endangerment or of wilful patient neglect in a medical case, three New York courts deprived Einaugler of his constitutional rights. To do so would be to use the federal constitution to micromanage the laws of New York State. Cf. Jackson, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16 (indicating that federal courts avoid "intrusions upon the power of the States to define criminal offenses" by reviewing habeas petitions that allege insufficiency of the evidence by referencing the "the substantive elements of the criminal offense as defined by state law").
 
 
 18
 Although it would have violated Einaugler's constitutional rights to be convicted without whatever proof is required by the laws of New York, we find no requirement of direct expert testimony in New York law, and hence we cannot conclude that a constitutional violation occurred in his case.[3]
 
 B. Einaugler's Other Claims
 
 19
 Einaugler's arguments regarding the admission of evidence of the patient's death and the constitutional invalidity of the statutes, as they were applied to him, can be dismissed summarily.
 
 
 20
 Einaugler argues that his conviction is unconstitutional as applied because the statutes under which he was convicted provided inadequate notice to him that his conduct might be criminal and because they punished him for exercising his medical judgment. A penal statute is void for vagueness unless it "gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and ... provides explicit standards for those who apply it." United States v. Nadi, 996 F.2d 548, 550 (2d Cir.1993) (internal quotation marks, brackets, and citations omitted). Einaugler was convicted pursuant N.Y. Public Health Law § 12-b and N.Y. Penal Law § 120.20. The language of these statutes and the definitions to which they refer are not vague in that they are clearly meant to apply to situations such as this one. Moreover, the laws include a scienter requirement--that the endangerment be reckless and that the neglect be knowing--and the Supreme Court has stated "a scienter requirement may mitigate a law's vagueness especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (footnote omitted). Nor was Einaugler punished under the statute simply for exercising reasonable medical judgment erroneously. See Colautti v. Franklin, 439 U.S. 379, 395-97, 99 S.Ct. 675, 685-87, 58 L.Ed.2d 596 (1979). To convict Einaugler, the jury was required to find, and did find, that he was aware that the patient required a course of treatment that he did not provide. Accordingly, Einaugler's claims based on vagueness and arbitrariness of application are without merit.
 
 
 21
 Einaugler also contends that the district court erred in rejecting his argument that prosecution testimony mentioning Lamour's death and discussing its cause denied Einaugler a fair trial because such testimony was irrelevant to the crimes charged and was highly prejudicial. Even if we assumed that the testimony was erroneously admitted, and that this was an error of constitutional magnitude, we do not believe, considering the case as a whole, that the evidence of Lamour's death was so prejudicial as to create a reasonable probability that the jury would have given a different verdict had that evidence not been introduced. We thus have no basis to reverse on this ground.
 
 III. CONCLUSION
 
 22
 We believe that a rational trier of fact could have found proof of Einaugler's guilt beyond a reasonable doubt. We also hold that the statutes under which Einaugler was charged were not unconstitutional as applied to him, and or that he was not denied a fair trial by the introduction of evidence that he alleges was prejudicial. Accordingly, we affirm the order of the district court.
 
 HAIGHT, Senior District Judge, dissenting:
 
 23
 I respectfully dissent because I think that a lay jury could not, consistent with the Constitution, find that the State proved the elements of the crimes charged, in the absence of competent medical opinion testimony. Moreover, I do not believe that sufficient evidence was adduced at trial to prove that Einaugler had the requisite knowledge of the risk to his patient to sustain a conviction under the statutes at issue.
 
 
 24
 The majority acknowledges that a constitutional violation would have occurred if Einaugler was convicted without proof required by New York law. But it can discern no requirement in that law of direct expert testimony. In my view, the requirement is inherent in the nature of the crimes charged, and arises from New York appellate decisions.
 
 
 25
 The State charged that Einaugler, in his medical treatment of Alida Lamour, committed the crimes of reckless endangerment and willful patient neglect. As the majority notes, and in the context of this case, the reckless endangerment charge required proof that Einaugler, in the course of his medical treatment of Lamour, recklessly engaged in conduct that created a substantial risk of serious physical injury. The element of recklessness required proof that Einaugler's medical treatment grossly deviated from a reasonable physician's standard of conduct, and that Einaugler consciously disregarded a substantial risk of death or protracted impairment. A charge of wilful patient neglect required proof that Einaugler failed to provide appropriate medical treatment to Lamour, with knowledge that his conduct was illegal.
 
 
 26
 The State offered no medical expert opinion testimony that the delay in transferring Lamour from the nursing home to the hospital would create the kind of risk required under the statute. If Lamour's estate had sued Einaugler for malpractice on that theory, the case could not have gone to the jury without such evidence, see Sitts v. United States, 811 F.2d 736, 739-41 (2d Cir.1987) (applying New York law), because the issues presented would "quite obviously not [be] ... within the realm of competence of a lay jury," McDermott v. Manhattan Eye, Ear & Throat Hosp., 15 N.Y.2d 20, 255 N.Y.S.2d 65, 68, 203 N.E.2d 469 (Ct.App.1964). I think it is anomalous to conclude that New York law allows the imposition of criminal sanctions on the basis of proof less demanding than that required to establish civil liability. The inability of lay jurors to make medical judgments is the same in either case.
 
 
 27
 The majority is not troubled by that because no New York court has held that a conviction for criminal reckless endangerment of a patient by a treating physician requires direct expert testimony. I concede that narrow point, but do not consider it dispositive. There is ample authority in the New York cases for the broader proposition, logically applicable to the case at bar, that a lay jury may not convict a defendant of criminal conduct if expert opinion testimony is necessary to prove an essential element of the crime. This is as true when the issue for the jury is the degree of risk posed by the defendant's conduct in a reckless endangerment prosecution, see People v. Grossman, 124 A.D.2d 974, 508 N.Y.S.2d 815, 816 (4th Dept.1986) ("Although most people are familiar generally with the properties of natural gas, whether the actions of the defendant created a grave risk of death is not within the common understanding of the average layperson, and expert testimony was required to meet the People's burden of proof") (citations omitted), appeal denied, 69 N.Y.2d 746, 512 N.Y.S.2d 1050, 505 N.E.2d 248 (Ct.App.1987), as it is with any other matter not normally within a criminal jury's understanding, see People v. Kenny, 36 A.D.2d 477, 320 N.Y.S.2d 972, 974 (3d Dept.1971) (prosecution for possession of marijuana) ("Expert evidence was required to identify the substance since the subject under consideration was not within the knowledge or experience of ordinary jurors."), aff'd 30 N.Y.2d 154, 331 N.Y.S.2d 392, 394, 282 N.E.2d 295 (Ct.App.1972) ("It seems probable that a number of people in the general community now can, or think they can, recognize marijuana, but the resulting skill is not yet so general that the State should be willing to rest a conviction and prison sentence solely on a young person's two or three isolated experiences with what he thinks is 'pot.' ").
 
 
 28
 At the very least, whether Einaugler's medical treatment of Lamour created a significant risk of her death, or constituted willful patient neglect, are questions equally beyond the common understanding of the average layperson. Accordingly New York law required the State to furnish expert evidence, and in its absence these convictions should not stand.[4]
 
 
 29
 Even were I to accept the majority's construction of New York law, I could not agree that the jury was presented with sufficient evidence to support Einaugler's conviction. I find the proof adduced by the State at trial entirely inadequate to show that Einaugler acted in conscious disregard of the risk to Lamour's life, as is required under the reckless endangerment statute, or that he knew his conduct was illegal, as is required to show a violation of the Public Health Law. Unlike the majority, I do not find evidence for the proposition that Einaugler, as a result of his telephone conversation with Dunn, was aware that a ten hour delay in treatment would place Lamour at substantial risk of serious physical injury.
 
 
 30
 According to the majority, it was possible for a reasonable jury to infer that Dunn "conveyed immediacy" when he instructed Einaugler to transfer his patient. The majority supports this proposition with a notation indicating that Lamour was to be sent to the "ER," and Dunn's statement that he told Einaugler that Lamour should be "admitted to the hospital ... period."
 
 
 31
 The "ER" note states only that Lamour should be sent for "evaluation," not that any emergency treatment was warranted. As to Dunn's testimony, it is indeed probative--not of the State's argument, but of the appellant's. When Dunn's quote is read in context, it permits only the opposite conclusion from that drawn by the majority. Here is the full text of the exchange at issue:
 
 
 32
 Court: Did you direct Dr. Einaugler to have the patient sent to a hospital immediately?
 
 
 33
 Dunn: I directed the patient--Dr. Einaugler to have the patient admitted, period.
 
 
 34
 Court: What did you mean by that?
 
 
 35
 Dunn: I meant it should be done in urgent fashion, which would probably mean that day.
 
 
 36
 State: Now, did you expect Dr. Einaugler to do that directly?
 
 
 37
 Dunn: Yes, as indeed the patient to the hospital was admitted that day ....
 
 
 38
 Two things may be divined from this passage. First, Dunn denied telling Einaugler that Lamour needed to be transferred immediately.[5] Second, to the extent Dunn believed that Lamour needed to be treated within a certain time period, Einaugler ultimately complied with Dunn's wishes.
 
 
 39
 In any event, both strands of evidence to which the majority clings are inadequate to overcome the clear assertions made by Dunn himself. At trial Dunn continually declined to accept the proposition that the majority now seeks to infer from the above cited exchange and from the "ER" notation: that he conveyed to Einaugler that Lamour needed to be transferred immediately. Rather, he testified again and again that he did not believe Lamour's condition warranted such advice. For example, he stated specifically that he did "not think that there was an emergency situation" when he spoke to Einaugler; he "would say even on Monday morning that [Lamour] was not in immediate danger of dying"; and a delay of 10-11 hours in Lamour's transfer would not have caused him to "rant and rave," but was "in the realm of the window that [he] had to work with."
 
 
 40
 In short, to find Einaugler guilty of this charge, the jury had to conclude that Dunn instructed Einaugler in a manner contrary to his own professed beliefs as to the proper timeframe for transfer, and contrary to what he told the court he had intended to convey. This Court's precedents concededly allow us great leeway in cobbling together inferences in support of a jury verdict. I do not believe, however, that we may conclude that a witness's testimony meant something which the witness himself said it did not.[6]
 
 
 41
 On this appeal, we must be satisfied that there was enough evidence to prove each element beyond a reasonable doubt. See U.S. v. Martinez, 54 F.3d 1040, 1043 (2d Cir.) (opinion of Walker, J.), cert. denied, --- U.S. ----, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995). The majority's construction of the record is premised on a level of deference to a jury's findings which is unwarranted, even under the narrow standard of review applicable to claims of insufficient evidence.
 
 
 42
 The fruits of such deference are apparent from the facts of this case. It is undisputed that when Einaugler learned of his patient's condition, he contacted a nephrologist who could advise him on how to proceed. That nephrologist, according to his own testimony, told Einaugler to get Lamour into a hospital, by which he meant that Einaugler should do so "that day." Ten hours later, Einaugler complied with these instructions. For this conduct, he has been branded a felon.
 
 
 43
 Because I do not believe that the proof adduced at trial can support this conclusion, and because the jury was required to draw inferences which it was not competent to make in order to reach a guilty verdict, I respectfully dissent. I would reverse the district court and allow the writ.
 
 
 
 *
 The Honorable Charles S. Haight, Jr., Senior District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 We need not consider whether Einaugler would be entitled to habeas relief if New York state had convicted him on the basis of evidence that, though federally sufficient, was insufficient as a matter of state law, where state law imposes a higher standard for sufficiency than does federal law. This is so, first, because he failed to raise such a claim, and second, because New York applies the federal habeas standard described in Jackson to evaluate sufficiency of the evidence on appeal. See Liberta v. Kelly, 839 F.2d 77, 80 n. 1 (2d Cir.1988); Hawkins v. West, 706 F.2d 437, 440 (2d Cir.1983); People v. Contes, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 350, 454 N.E.2d 932, 933 (1983)
 
 
 [2]
 Einaugler, of course, contended that the note was a subsequent, ungrammatical, recording of his own decision to send Lamour to the hospital. On a challenge to the sufficiency of the evidence, however, we must take it as given that the jury chose not to believe Einaugler's version of what the note signified, and instead read it to reflect an order by Dunn
 
 
 [3]
 A constitutional violation could still be found if the United States Constitution mandated that every conviction of a medical doctor for negligence requires expert testimony to establish the standard of care. But that is neither plausible nor seriously argued
 
 
 [4]
 The majority argues that the New York courts' affirmance of Einaugler's conviction provides evidence that New York law does not require expert opinion testimony in a prosecution for reckless endangerment by a physician of his patient. I do not think that is a sufficient response to a Federal habeas proceeding, particularly where the opinions in question did not address the issue. Every time this Court reviews a properly exhausted habeas petition raising sufficiency of the evidence, the state appellate courts have already rejected that claim
 
 
 [5]
 Dunn himself has corroborated this interpretation in an affidavit contained in the parties' joint appendix. See Dunn Aff. p 3 in App. 1731 ("By my answer, I intended to convey to the jury that I did not tell Dr. Einaugler there was an immediate need for hospitalization of the patient."). It is not clear if the appellant has presented this document to the requisite levels of state collateral review so that it may be considered in ruling on his habeas petition, and my dissent is not premised on this evidence, as the record itself amply confirms Dunn's present explanation of his testimony. It should give us some pause, however, that the majority's construction of the record is not even supported by the very witness upon whose testimony it relies
 
 
 [6]
 The other evidence relied on by the majority also does not stand up to scrutiny. Khaski, who was not a nephrologist, merely counseled Einaugler that Lamour should be hospitalized; he said nothing about the time frame in which this should take place, and was entirely silent on the risk of a ten hour delay. Unlike the majority, I cannot find any support in Khaski's testimony for the notion that Einaugler was told the transfer should be undertaken "in short order"; Khaski gave no such indication. Furthermore, Khaski spoke to Einaugler "around midday," only about four hours before Lamour was transferred